IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURA ANN THOMAS | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-6439 |
| | : | |
| CAROLYN W. COLVIN,[1] | : | |
| *Acting Commissioner of Social Security* | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                             **May 30, 2014**

        Plaintiff Laura Ann Thomas seeks review of the denial of her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) by the Commissioner of Social Security. United States Magistrate Judge Jacob P. Hart has issued a Report and Recommendation (Report) recommending that Thomas's request for review be denied. Thomas objects to the Report, asserting the Administrative Law Judge (ALJ) and the Magistrate Judge erred in evaluating the evidence regarding the fatigue she suffers as a result of her multiple sclerosis, her neck and back impairments, and her mental health medications. Upon de novo review of Thomas's objections, the Court agrees with the Magistrate Judge that the ALJ's findings that Thomas's impairments were not disabling during the period in question are supported by substantial evidence. Consequently, Thomas's objections will be overruled, the Report will be approved and adopted, and Thomas's request for review will be denied.

**BACKGROUND**

        Thomas applied for DIB and SSI on December 30, 2009, claiming she had been disabled since April 29, 2008, as a result of multiple sclerosis, optic neuritis, depression, arthritis, a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rule of Civil Procedure 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this case.

bulging disc in her neck, and a pinched nerve.  After her applications were initially denied, a hearing was held before an ALJ, at Thomas's request, on March 1, 2011.  On April 4, 2011, the ALJ issued a written decision denying Thomas's applications for DIB and SSI.  Applying the Social Security Administration's (SSA) five-step sequential evaluation process for determining whether a claimant is disabled,[2] the ALJ made the following findings:  (1) Thomas had not engaged in substantial gainful activity since her alleged disability onset date of April 29, 2008; (2) she suffered from the severe impairments of a neck disorder, a low-back disorder, bilateral carpal tunnel syndrome, multiple sclerosis, and a dysthymic disorder; (3) these impairments did not meet or medically equal a listed impairment; (4) Thomas retained the residual functional capacity to perform "light work,"[3] subject to certain additional limitations, and was capable of

---

[2] The Commissioner uses the same five-step process to determine whether an individual is disabled in both SSI and DIB cases.  *See* 20 C.F.R. §§ 404.1520 (SSI), 416.920 (DIB).  The Commissioner must first determine whether the claimant is currently engaging in substantial gainful activity.  If so, the claimant is not disabled.  Second, the Commissioner must determine whether the claimant has a severe, medically determinable physical or mental impairment.  If the answer to this question is "no," the claimant is not disabled.  At the third step, the Commissioner must determine whether the claimant's severe impairment meets or is medically equivalent to an impairment listed in Appendix I to Subpart P of 20 C.F.R. Part 404.  If so, the claimant is disabled.  If not, the Commissioner must assess the claimant's residual functional capacity to determine, at the fourth step, whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  If not, the claimant will be found to be disabled unless the Commissioner demonstrates, at the fifth step, that the claimant is capable of performing other available work.  *See Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001) (describing the five-step sequential evaluation process).

[3] Under the applicable SSA regulations, "light work" is work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).  To be considered capable of performing a full range of light work, a claimant must have the ability to perform work that "requires a good deal of walking or standing, or . . . involves sitting most of the time with some pushing and pulling or arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).  The ALJ found Thomas could perform light work subject to the additional limitations that pushing and pulling with her upper and lower extremities was limited to the lifting and carrying capacity; she could never climb ladders, ropes or scaffolds or perform balancing; she could not perform repetitive fingering, such as keyboarding; she needed to avoid concentrated exposure to extreme hot temperatures, humidity,

performing past relevant work as a housekeeper/cleaner and fast food worker; and (5) even if Thomas was limited to "sedentary work,"[4] with the same non-exertional limitations, there were a significant number of unskilled sedentary exertional level jobs she could perform. R. at 16-24. The ALJ therefore concluded Thomas was not disabled from April 29, 2008, through April 4, 2011, the date of his decision.[5] The Appeals Council denied Thomas's request for review, and Thomas thereafter filed the instant action seeking review of the Commissioner's decision.

In her request for review, Thomas argues the ALJ failed to properly assess her symptoms of fatigue caused by her multiple sclerosis, the extent of her limitations due to her neck and back impairments, and the effects of her mental health medications. After reviewing the administrative record, the Magistrate Judge issued a Report addressing each of the asserted errors, and concluding the ALJ's findings that Thomas's impairments were not disabling were

---

and hazards such as moving machinery and unprotected heights; and she was limited to simple, routine tasks due to a moderate limitation in concentration, persistence and pace. Record (hereinafter "R.") at 20.

[4] "Sedentary work" is work that involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). By definition, sedentary jobs involve sitting, but they may also require "a certain amount of walking and standing . . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id. §§ 404.1567(a), 416.967(a).

[5] In May 2011, shortly after the ALJ denied her December 2009 applications, Thomas filed new applications for DIB and SSI, claiming she had been disabled since April 5, 2011, the day after the ALJ issued his April 4, 2011, decision. Like her earlier applications, these new applications were initially denied, and, after a February 21, 2013, hearing, a different ALJ issued a written decision denying the applications on March 2, 2013. Thomas has also sought review of the ALJ's March 2, 2013, denial of her May 2011 DIB and SSI applications, and Judge Hart has recently issued a Report and Recommendation recommending that Thomas's request for review be granted in part and that the case be remanded to obtain further medical evidence regarding the fatigue Thomas suffers as a result of her multiple sclerosis. See Thomas v. Colvin, Civil No. 13-5791, Report & Recommendation (Apr. 2, 2014), ECF No. 17. The Court will act separately on Thomas's request for review in this later-filed case, which concerns whether Thomas was disabled during a later period of time than is at issue in this case (i.e., after April 5, 2011), based on medical records and other evidence that were not before the ALJ in this case.

supported by substantial evidence. Thomas objects to the Magistrate Judge's conclusion as to each of her impairments.

**DISCUSSION**

Under 28 U.S.C. § 636(b)(1), this Court reviews Thomas's objections to the Report de novo. Review of a final decision of the Commissioner of Social Security, however, is limited to determining whether the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence requires "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (citations omitted). The substantial evidence standard is satisfied "if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). If the ALJ's decision is supported by substantial evidence, the district court is bound by the ALJ's findings, even if it "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

**A.      Fatigue**

Thomas first objects to the Magistrate Judge's conclusion that substantial evidence supports the ALJ's finding that the fatigue she suffers as a result of her multiple sclerosis is not disabling. The evidence regarding Thomas's fatigue comes from two main sources: the medical records of her neurologist, Pasquale Brancazio, D.O., who has treated her since at least July 2007, and Thomas herself.

In July 2007, nine months before her asserted April 2008 disability onset date, Thomas saw Dr. Brancazio for a neurologic consultation regarding her multiple sclerosis and complained

of fatigue that was "present most of the time," for which Brancazio prescribed amantadine.[6] R. at 434, 436. In September 2007, Thomas reported she had "noticed some improvement" with amantadine, but continued to complain of persistent fatigue, prompting Dr. Brancazio to prescribe an increased dosage. R. at 433. In December 2007, however, Brancazio noted amantadine had been ineffective and told Thomas to stop taking it and to call if her fatigue "worsen[ed] off of it." R. at 432. Thomas thereafter began taking Provigil for her fatigue, and in May 2008, she reported it "work[ed] quite well." R. at 430. In August 2008, Thomas again reported Provigil helped her deal with fatigue, which she experienced "from time to time." R. at 428. In November 2008, Thomas reported fatigue "continue[d] to be an issue," noting that at times Provigil seemed to help, but at other times, fatigue "interfere[d] with her activities of daily living." R. at 427. Thomas continued to take Provigil for fatigue until her insurance company stopped covering it sometime after July 2009. Dr. Brancazio's treatment notes from March 2009 and July 2009—while Thomas was still taking Provigil—do not reference any complaints of fatigue. *See* R. at 425, 439. Thomas again complained of fatigue in November 2009, for which Dr. Brancazio recommended that she re-try amantadine—100 mg daily for two weeks, then twice daily, if necessary. R. at 437-38. Although Thomas's counsel indicated she expected to submit updated treatment records from Dr. Brancazio following the March 1, 2011, hearing, *see*

---

[6] Following her July 2007 consultation, Thomas underwent a brain MRI, which "revealed findings consistent with her diagnosis of multiple sclerosis." R. at 433. Although one new lesion was noted in the July 2007 MRI, as compared to an earlier MRI done in May 2005, R. at 447, Dr. Brancazio characterized Thomas's multiple sclerosis as "relatively stable," throughout his treatment records, R. at 433 (September 2007); *see also* R. at 432 (noting Thomas "denie[d] any new problems as they relate to her multiple sclerosis" in December 2007), 430 (characterizing Thomas's multiple sclerosis as "stable at this time" in May 2008), 428 (noting the absence of "any new symptoms related to [Thomas's] MS" in August 2008), 427 (noting Thomas "denie[d] any new symptoms related to her MS" and was "neurologically stable" in November 2008), 425 (noting Thomas was "doing about the same" in terms of her multiple sclerosis in March 2009). An April 2009 brain MRI revealed no new lesions. R. at 444.

R. at 33, no additional records were submitted before the ALJ issued his written decision on April 4, 2011, *see* R. at 14.

Thomas also testified about her fatigue at the hearing, stating she had been experiencing fatigue for years; she experienced fatigue requiring her to rest "about five times a week," or "basically like almost every day"; and her bouts of fatigue could last for hours, requiring her to sit down for "a couple of hours." R. at 38-39, 50-51. Thomas explained that after walking from her home to the corner store two blocks away and back, she sits down and rests for 30 to 40 minutes. R. at 51. Regarding her fatigue medications, Thomas stated she had previously taken Provigil for quite a while, but "it didn't do too much," and that amantadine, which she was taking at the time of the hearing, was "not helping that much at all." R. at 39-40.

In evaluating Thomas's fatigue, the ALJ found Thomas had a medically determinable impairment—multiple sclerosis—that could reasonably be expected to cause fatigue, but concluded the record did not support her allegations regarding the intensity, persistence, and limiting effects of her fatigue.[7] Specifically, the ALJ found Thomas's testimony that she experienced fatigue "that cause[d] her to lay down and rest for hours at a time" about five times a week was not credible, observing (1) Dr. Brancazio's treatment notes did not reflect complaints consistent with this level of fatigue; (2) contrary to her hearing testimony that Provigil was

---

[7] In determining whether a claimant is disabled, the Commissioner must consider all of the claimant's symptoms (i.e., the claimant's "own description of [her] physical or mental impairment," 20 C.F.R. §§ 404.1528(a), 416.928(a)) and the extent to which those symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* §§ 404.1529(a), 416.929(a). A claimant's symptoms will be found to affect her ability to do basic work activities only if medical signs or laboratory findings show the claimant has a medically determinable impairment which "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* §§ 404.1529(b), 416.929(b). If the claimant has such an impairment, the Commissioner then must evaluate "the intensity and persistence of [the] symptoms [to] determine how [the] symptoms limit [the claimant's] capacity for work." *Id.* §§ 404.1529(c)(1), 416.929(c)(1).

ineffective in treating her fatigue, the treatment notes reflected her consistent reports that Provigil was helpful and that she stopped taking the drug because her insurance no longer covered it, not because it was ineffective; and (3) although he had left the record open for submission of updated medical records from Dr. Brancazio, Thomas had not submitted any additional records to support her claim that amantadine was ineffective.  *See* R. at 20-23. Although the Magistrate Judge found the ALJ's summary of the evidence regarding Thomas's fatigue was unfair to her in certain respects,[8] he nevertheless concluded the ALJ's determination that Thomas's fatigue was not disabling was supported by substantial evidence, noting the "big difference" between the complaints of fatigue reflected in Dr. Brancazio's treatment notes and in Thomas's own hearing testimony.  *See* Report 5 (noting "there is a big difference between [fatigue medication that] 'works quite well,' or even 'does seem to help' and five days per week of bed rest").

Thomas first objects that both the ALJ and the Magistrate Judge overstated her allegations about the impact of her fatigue and then relied on the mischaracterized testimony to conclude Thomas's allegations were not credible.  This objection lacks merit.  The ALJ characterized Thomas as testifying that she "experienced fatigue as a result of her multiple sclerosis about five times per week that causes her to lay down and rest for hours at a time."  R. at 20; *see also id.* at 23.  The Magistrate Judge characterized her as testifying that "fatigue caused her to spend significant amounts of time in bed five days a week."  Report 4.  In light of

---

[8] In particular, the Magistrate Judge noted the ALJ incorrectly characterized Thomas as having testified she stopped taking Provigil because it was ineffective when in fact she agreed with the ALJ's statement that she had discontinued the drug because her insurance company would not cover it.  Report 5.  The Magistrate Judge also observed that while Thomas did tell Dr. Brancazio Provigil worked "quite well," she still continued to complain of some degree of fatigue.  *Id.*

Thomas's actual hearing testimony, described above, these characterizations do not overstate Thomas's allegations regarding the extent of her fatigue.[9]

Thomas also objects to the Magistrate Judge's conclusion that substantial evidence supports the ALJ's finding that her fatigue was not disabling, arguing that medical evidence in the record—including Dr. Brancazio's treatment notes and MRI evidence showing her multiple sclerosis has progressed—supports the opposite conclusion. As the Magistrate Judge observed, Dr. Brancazio's records reflect that although Thomas reported she found Provigil helpful, she still continued to experience fatigue that at times "interfere[d] with her activities of daily living." Report 5 (quoting R. at 427). What the treatment notes do not reflect, however, is the level of fatigue to which Thomas testified at the hearing, i.e., almost daily fatigue lasting for hours at a time for which medication was ineffective. R. at 38-40. To the contrary, although medication may not have eliminated Thomas's fatigue, she consistently reported Provigil helped her symptoms, *see* R. at 427-30, and two of the three most recent treatment notes in the record—written after Thomas reported fatigue at times interfering with activities of daily living—do not reference any complaints regarding fatigue, *see* R. at 425-26, 439.

Thomas also faults the ALJ and the Magistrate Judge for failing to take into account the degenerative nature of her condition. As the Magistrate Judge noted, however, while Thomas's July 2007 MRI showed a new lesion, given the absence of any complaints about fatigue in March and July 2009, the treatment notes do not reflect a deterioration in Thomas's energy level following her April 29, 2008, disability onset date. Although Thomas again complained of fatigue in November 2009, after her insurance company stopped covering Provigil, she did not

---

[9] Indeed, in a supplemental function questionnaire completed in February 2010, Thomas reported she experienced fatigue "[d]aily, sometimes all day," stating "[o]ften I am unable to even rise from bed." R. at 195.

submit any updated treatment notes, as contemplated, to show an increase in fatigue or to substantiate her claim that amantadine was ineffective.[10] Given the disparity between Thomas's testimony about her fatigue and the complaints of fatigue reflected in Dr. Brancazio's treatment notes, the Court agrees there is substantial evidence in the record undermining Thomas's representations as to the intensity, persistence, and limiting effects of her fatigue.[11] The Court will therefore leave undisturbed the ALJ's decision that Thomas's fatigue was not disabling during the time frame at issue.

### B.  Neck and Back Impairments

With respect to her neck and back impairments, Thomas renews her objections that the ALJ failed to properly evaluate the evidence from her treating physician, William C. Murphy, D.O., and failed to give sufficient weight to the opinion of consultative examiner Ronald M. Block, M.D., that Thomas could not perform even sedentary work.

Dr. Murphy treated Thomas after she fell and injured herself at work in April 2008, and the record contains his treatment notes for the 18-month period from May 2008 to November 2009. Dr. Murphy first evaluated Thomas on May 14, 2008, at which time she complained of pain in her neck, her right shoulder and scapular area, and, to a lesser extent, her mid- and low-

---

[10] The Court recognizes Dr. Brancazio had previously discontinued Thomas's earlier amantadine prescription upon finding the drug had been ineffective. However, Thomas did not submit any updated treatment notes documenting her later experience with the drug, despite having requested and having been afforded an opportunity to do so.

[11] In concluding that substantial evidence supported the ALJ's finding that Thomas's fatigue is not disabling, the Magistrate Judge observed that many of the treatment notes reflecting complaints of fatigue were written prior to Thomas's asserted April 2008 disability onset date, while she was still working. Thomas objects that the Magistrate Judge's reliance on this consideration, which was not mentioned by the ALJ, runs afoul of the principle that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Fargnoli*, 247 F.3d at 44 n.7 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Because the ALJ's finding is supported by substantial evidence even without taking this factor into consideration, any error in this regard is immaterial.

back.  R. at 396.  Upon examination, Thomas exhibited painful range of motion in her cervical spine and right shoulder, but had full range of motion in her lumbar spine, albeit with some pain with extension and sidebending.  R. at 396-97.  Dr. Murphy noted Thomas had sustained a number of injuries, including cervical, right shoulder, thoracic, and lumbosacral strain/sprains, and recommended x-rays of the cervical spine and right shoulder, physical therapy, and medication for control of inflammation and muscle spasms.  R. at 397.  He also reported, without elaboration, that Thomas was "temporarily disabled from all employment pending her response to therapy."  *Id.*

Dr. Murphy reevaluated Thomas on June 9, 2008, and reviewed her x-rays, which revealed mild spondylosis in her cervical spine at C5-C6.  R. at 395, 398.  When examined, Thomas continued to exhibit pain and tenderness.  R. at 395.  Dr. Murphy recommended that she continue with physical therapy and medication and obtain an MRI of the cervical spine and an electrodiagnostic evaluation.  *Id.*  He again reported, without elaboration, that Thomas was "temporarily disabled from all employment pending further diagnostic work up and response to therapy."  *Id.*

The additional testing Dr. Murphy recommended was performed on June 23, 2008 (electrodiagnostic evaluation) and September 4, 2008 (MRI).  The electrodiagnostic evaluation revealed right C6 radiculopathy; left C5-6 nerve root irritation, acute to subacute; and mild bilateral carpal tunnel syndrome.  R. at 391, 393.  The MRI showed shallow disc bulges at C4-C5, C5-C6, and C6-C7 without mass-effect, and no stenosis.  R. at 400.  The MRI also revealed the "upper thoracic discs, canal and neural foramina appear[ed] normal" and there was "no change in alignment or appearance of the disc spaces under flexion or extension."  *Id.*

Dr. Murphy continued to see Thomas at regular intervals, and his treatment records reflect eleven additional office visits between June 2008 and November 2009.  *See* R. at 380-94.  In most of these visits, Thomas continued to complain of neck and back pain and exhibited some degree of pain upon examination, which Dr. Murphy treated with a combination of prescription pain medication[12] and physical therapy or a home exercise program.[13]  Although Thomas reported that both the medication and the physical therapy were helpful, *see, e.g.*, R. at 387 (noting in September 2008 that Thomas was "making some progress" in physical therapy and "has had good results with [Lyrica] to date"), Dr. Murphy continued to classify her as temporarily disabled.

Thomas also complained to Dr. Brancazio, her treating neurologist, about neck and back pain, both before and after she fell at work.  *See* R. at 425, 428, 432-34, 448, 450-51.  At Dr. Brancazio's recommendation, Thomas underwent MRIs of her lumbar and thoracic spine on August 11, 2009, both of which came back with normal results.  *See* R. at 440-43, 452.

On May 13, 2010, Thomas underwent a disability evaluation performed by Dr. Block.  In the narrative portion of his report, Dr. Block noted Thomas's multiple sclerosis symptoms included "primarily fatigue as well as the visual impairment and depression which has been exacerbated by the multiple sclerosis," and she also had "cervical radiculopathy as well as bilateral carpal tunnel syndrome" and was "seeing a physiatrist . . . for neck pain."  R. at 455.  Thomas reported her primary symptoms from her disc issues were "tightening and a pulling

---

[12] Dr. Murphy prescribed Lyrica for Thomas beginning in August 2008, but switched her to another drug when her insurance company stopped covering Lyrica a year later.

[13] The treatment notes reflect that Thomas continued with physical therapy until February 2009 when it began aggravating her symptoms, prompting her to switch to a home exercise program. R. at 385.  Dr. Murphy recommended that Thomas continue with her home exercise program and noted that her treatment options at this point were somewhat limited as she did not wish to have any invasive treatment.  *Id.*

sensation that radiates to both shoulders as well as the mid-thoracic area." R. at 455-56. Dr. Block also observed that upon physical examination, Thomas was in "no acute distress," though she "appear[ed] somewhat uncomfortable when she remain[ed] in a stable position, i.e., she need[ed] to move her position to alleviate this discomfort." R. at 457. A neurological exam revealed her gait, posture, weight bearing, and ambulation were "without difficulty"; her sensation motor reflexes were normal; and there was "no appreciable atrophy." *Id.*

Dr. Block also completed a medical source statement, in which he assessed Thomas's ability to perform certain work-related physical activities, and a range of motion chart. In the range of motion chart, Dr. Block indicated Thomas's range of motion was normal in all areas, and she had full grip strength in both hands. *Id.* at 461-64. In the medical source statement, however, Dr. Block found Thomas had significant limitations in a number of areas, noting, inter alia, that Thomas could lift and carry only two to three pounds occasionally and could stand and walk for one hour or less in an eight-hour day, due to intermittent weakness and pain in her neck and mid-back; could sit for less than one hour due to stiffness; and had limited ability to push and pull due to pain and instability. R. at 459.

The limitations Dr. Block found were more restrictive than Thomas's own hearing testimony suggests. For example, while Dr. Block indicated Thomas could stand, walk, and sit for less than one hour in an eight-hour day, *id.*, at the hearing, Thomas estimated she could stand for "about two hours" before experiencing a "pulling" or a "tiredness" in the middle part of her back toward her shoulders, and stated she did not "really have a lot of problems sitting," except that, due to discomfort, she did not like to sit for too long, but needed to "get up, sit down and maybe get up." R. at 44-45. Thomas did not identify any other exertional limitations attributable to her neck and back impairments.

In evaluating Thomas's residual functional capacity, the ALJ considered the medical evidence from Dr. Murphy. The ALJ referenced a number of Dr. Murphy's treatment notes, commenting on Thomas's complaints of neck and back pain, the results of Dr. Murphy's initial examination of Thomas, his treatment recommendations, and Thomas's response to the prescribed treatment. *See* R. at 21-22. He also discussed the results of all of the testing ordered by Dr. Murphy, including the x-rays, the electrodiagnostic evaluation, and the MRI. *See id.* He did not, however, mention Dr. Murphy's statements that Thomas was temporarily disabled.

The ALJ also considered Dr. Block's evaluation, but gave his assessment of Thomas's limitations "little weight," finding his opinions were inconsistent with the record as a whole, including the results of his own examination of Thomas and Thomas's hearing testimony. R. at 23-24. Specifically, the ALJ found Dr. Block's conclusion that Thomas was not capable of standing, walking, or sitting for a full eight-hour workday due to stiffness, pain, and weakness in her neck and back was inconsistent with (1) the findings elsewhere in his report that Thomas was in no acute distress, had no difficulties with gait, posture, weight bearing, or ambulation, and had a full range of motion in all joints, and (2) Thomas's own testimony that she had no difficulty with sitting, provided she could stand up intermittently, and that she could stand for up to two hours at a time. R. at 23.

Thomas objects that the ALJ erred in evaluating the evidence from Dr. Murphy because he did not mention Dr. Murphy's statements that Thomas was temporarily disabled and overlooked many of his findings on examination of Thomas. Whether a claimant is disabled is an issue reserved to the Commissioner, and a statement by a medical source that a claimant is "disabled" or "unable to work" does not mean the Commissioner will find the claimant is disabled. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). While an ALJ may not ignore opinions

from treating sources on these issues, *see* SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996), such opinions are not entitled to any special significance under the SSA regulations, 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  As the Magistrate Judge noted, the ALJ in this case considered the relevant findings in Dr. Murphy's treatment records, including the results of all of the testing he ordered.  *See Adorno v. Astrue*, 40 F.3d 43, 47-48 (3d Cir. 1994) (recognizing a treating physician's statement that a claimant is "disabled" is not dispositive of the issue, and noting the ALJ "must review all the medical findings and other evidence in support of the attending physician's opinion of total disability").  In these circumstances, the Court agrees with the Magistrate Judge that the ALJ's failure to specifically mention Dr. Murphy's statements that Thomas was temporarily disabled is immaterial.  *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 n.2 (3d Cir. 2008) (rejecting argument that ALJ improperly disregarded treating physician's testimony that claimant's impairments rendered her unable to perform her past relevant work and several other jobs she had been offered, as "[t]his is not the sort of treating source medical opinion entitled to any kind of weight" under the SSA regulations).

      Thomas also objects that the ALJ's finding that her neck and back pain is not as extensive or disabling as Dr. Block indicates is not supported by substantial evidence because the ALJ failed to consider other evidence in the record regarding her pain, including Dr. Block's references to cervical radiculopathy and pain, her complaints of pain to Dr. Brancazio, and her hearing testimony that sitting too long is uncomfortable and she has to get up.  The record does not support Thomas's assertion that the ALJ disregarded Dr. Block's references to pain.  To the contrary, although the ALJ rejected Dr. Block's assessment of Thomas's capacity to sit and stand as inconsistent with his examination of Thomas and her own hearing testimony, he incorporated Dr. Block's assessment that Thomas was limited in her ability to push and pull with her upper

and lower extremities. *See* R. 20, 459. Thomas's argument that the ALJ disregarded her hearing testimony is also incorrect. Contrary to Thomas's assertion, the ALJ took her need to change position into account, noting she testified "she has no difficulty with sitting, *provided that she is able to stand up intermittently*." R. at 23 (emphasis added). Although the ALJ did not mention the references to pain in Dr. Brancazio's treatment notes, following Thomas's fall at work, Dr. Brancazio noted she was under Dr. Murphy's care for her neck and back issues, and the MRIs Dr. Brancazio ordered were normal. R. at 428, 440-43. The Court agrees with the Magistrate Judge that notwithstanding the ALJ's failure to discuss Thomas's complaints of pain to Dr. Brancazio, the ALJ's finding that Thomas's pain was not as extensive or limiting as Dr. Block indicated is supported by substantial evidence, including Block's own physical examination of Thomas, the MRI reports, and Thomas's own hearing testimony.

Finally, the Court agrees with the Magistrate Judge that even if the ALJ underestimated Thomas's pain in finding she could engage in a limited range of light work, remand is not warranted because the ALJ found, in the alternative, that even if Thomas was limited to sedentary work with the same non-exertional limitations, there are a significant number of jobs she could perform.[14] Although Thomas objects that conclusions about residual functional capacity must be supported by medical evidence, substantial evidence, including Dr. Block's normal physical examination of Thomas and her own hearing testimony that she did not "really have a lot of problems sitting," so long as she could change position, R. at 45, supports the ALJ's finding that Thomas could perform at least sedentary work.

---

[14] At the hearing, the vocational expert testified that a hypothetical individual who was limited to sedentary exertional level work with the same non-exertional limitations as Thomas could work as a clerical addressor, a surveillance system monitor, or a telephone information clerk. R. at 56.

### C. Depression

In assessing the effects of the Thomas's mental impairment—a dysthymic disorder[15]—on her residual functional capacity, the ALJ observed that the record showed "only minimal evidence of mental health treatment since [the] alleged onset date," and that Thomas had "intermittently treated her symptoms with medications provided by her primary care provider and her neurologist and . . . ha[d] reported improvement or even control of her depressive symptoms when she has been taking medication." R. at 23. Thomas takes issue with the conclusion that her mental health medications were effective, pointing to perceived inconsistencies in the record. Thomas notes the ALJ (1) incorrectly stated she never filled her prescription for Cymbalta when in fact the record reflects she took Cymbalta for a period of time but did not like the side effects, and (2) ignored evidence in the record that she had been treated for depression with various drugs, including Pamelor, Lexapro, Remeron, and Paxil, all of which either did not work or had intolerable side effects.

The ALJ concluded Thomas had reported improvement of her depressive symptoms when taking medication based on her experience with Pamelor (nortripyline), which Dr. Brancazio prescribed for her on March 23, 2009.[16] R. at 425-26. During that visit, Thomas reported nortriptyline had worked rather well for her in the past. R. at 425. On July 10, 2009, Thomas reported nortriptyline had helped her feel less depressed and apathetic, and denied any

---

[15] Dysthymia is "a chronic type of depression in which a person's moods are regularly low," though "symptoms are not as severe as with major depression." *See* http://www.nlm.nih.gov/medlineplus/ency/article/000918.htm (last visited May 30, 2014).

[16] Dr. Brancazio had previously prescribed Cymbalta for Thomas's depression on August 6, 2008, R. at 428-29, but as of her November 4, 2008, visit, Thomas had not filled the prescription, R. at 427. On March 23, 2009, Thomas reported she "did end up taking Cymbalta for a little bit, but did not like the side effects of it," thus prompting the switch to Pamelor. R. at 425-26.

side effects. R. at 439. Thomas repeated this observation during her May 13, 2010, examination by Dr. Block, reporting she had been on multiple medications for depression, but Pamelor "work[ed] the best for her." R. at 456. At the hearing, Thomas testified she had been taking Pamelor for about two years with no side effects. R. at 40-42. Although prior to receiving a Pamelor prescription from Dr. Brancazio, Thomas apparently included Pamelor in a list of drugs that had either not worked for her or had intolerable side effects,[17] her experience with Pamelor while under Dr. Brancazio's care amply supports the ALJ's conclusion that she reported improvement of her depressive symptoms when taking medication after her alleged disability onset date, particularly in light of her statement to Dr. Brancazio seven months later that nortriptyline had worked "rather well" for her in the past. R. at 425.

The ALJ's erroneous assertion that Thomas never filled her prescription for Cymbalta likewise does not undermine his finding that Thomas had reported improvement of her depressive symptoms with medication, which, as noted, was based on Thomas's experience with Pamelor.

**CONCLUSION**

For the reasons set forth above, the Court agrees with the Magistrate Judge that the ALJ's findings regarding Thomas's fatigue, neck and back impairments, and mental health medications are supported by substantial evidence. Accordingly, Thomas's objections to the Report will be overruled, the Report will be approved and adopted, and Thomas's request for review will be denied. An appropriate order follows.

---

[17] Dr. Brancazio's treatment notes from August 28, 2008, reflects that Thomas reported she had previously been treated with Pamelor, Lexapro, Remeron, and Paxil, which "either did not work or had intolerable side effects." R. at 428.

BY THE COURT:


_/s/ Juan R. Sánchez_
Juan R. Sánchez, J.